The District Court committed four errors in this case, each independently or to the K-3 complaint, and each independently or to the person. The first was the failure to suppress evidence from the unlawful search with Mr. Doe's cell phone. The second was the failure to suppress evidence from the unlawful search with Ms. McAuliffe's phone and underwent surgery. The third was the improper admission of testimonial hearsay in violation of the confrontation clause. And the fourth was the improper admission of ballistics expert testimony. I want to start first with the cell phone search errors. The Supreme Court's decision in Riley v. California made clear that cell phones differ both in qualitative and quantitative sense from other objects, and individual privacy interests in cell phones are therefore much greater than many other objects, and even the home. Chief, I know that you want to start on this issue, but it's sort of interrelated with the search of the home, and that was the District Court's factual finding with regard to consent both as to the search of the home and asking the officers to look at the cell phones and things like that. So, that being about it, I'm not too familiar with any of the communication because this was sort of handed to me. Yeah, I'll address that. I think the District Court found that the consent that was given to Ms. McAuliffe, who was still detained at the scene, was limited at the scene to these outgoing call logs, right? Because the situation there was the police showed up in response to what turned out to be a phony or a false 911 report, and so there the consent was limited to the call logs. Now, there's the issue of what happened later at the police station, and again, if you look at the record, our position is that whatever consent Mr. Johnson gave to the officers there was also limited to any communications between him and his ex-boyfriend. I think there's limited consent, or it is well recognized, and so our position is that notwithstanding that, that consent cannot go within court. Perhaps another exception for the police to then undertake a warrantless search of the rest of the contents of the cell phone. Okay. Thank you, Mr. Chairman. I know that you have a history of specifically establishing consent for the search of the phone, which as I understand it was based on an express adverse credibility determination, which is to just look at the current number of friends that I have, or whatever I'm calling it. Correct. And crediting the testimony of the circumstances that you were involved in. So I think that our argument is that notwithstanding the adverse credibility finding, all the other undisputed facts in the record make it such that the circumstances of the encounter were such that any consent that Mr. McAuliffe gave to officer-wise could not be voluntary under Humber v. North Carolina, and in this case it's fraudulent consent. But doesn't that beg the question as to whether or not her testimony was believable in the face of the express findings by Judge Breyer, or was it Judge Anderson? Judge Anderson. In the suppressive hearing, he made a, I guess, a biased question on the fact that the consent was certainly involuntarily given. So I think one really important fact that Mr. McAuliffe and the district court did overlook was in crediting all of the officers who testified, including officer-wise. His testimony is probably the most important because he was the one who made contact with Mr. McAuliffe. Officer-wise testified at the suppressive hearing that he handcuffed Mr. Johnson outside the presence of Mr. McAuliffe and said he was doing so because he was on parole. The district court did not, in crediting the officers' testimony and concluding that we collected that nondisputed fact, it is our position that regardless of whether the fact that officer-wise asked Mr. McAuliffe for permission to search the home thereafter, any consent she gave thereafter was followed and expressed in the search by the police of their authority to be able to search the home without a warrant. I don't know if the police are interested in your argument, but I thought her testimony was that she never saw him in handcuffs. So, and if that's true, then why did the district court here, in relying on her testimony at least to the extent that it found she consented, given the testimony of officer-wise, I think it was the error to render, make an adverse credibility finding as to this foul point, but then pluck the one piece that is contradicted by officer-wise's testimony. Thank you. You, dear trial lawyer, we're all familiar with the situation where the jury is permitted to credit all of the testimony. Who will witness none of the testimony or some of the testimony? Isn't that the situation that we have here? We have to rely on the prior fact to sort of pick and choose, given all the other evidence in the case, what the fact finder says actually happened. I think, yes and no. I think putting that aside, all the other circumstances of the search really cast doubt on whether any consent she gave could have been voluntary. You know, the police arrived on scene. There were six officers who immediately were there. Twelve officers ultimately left the scene of what is a very small apartment in the Patrol Projects. You know, I've been there myself. It's maybe 200 square feet. The circumstances... It's in an apartment building, though, right? It's in a complex where... And it's an apartment building. It's in a dual-locality apartment, correct? So I can't fault the police for condescending force in response to this true call. I agree, Your Honor. But at the same time, I think that then changes the circumstances of the encounter. It makes it more likely to be coercive. But isn't the question one of two? I mean, in other words, if the district court found that the consent was given before all these other officers arrived and found they were conducting a parole search, at that point, is legally irrelevant, is it not? As to whether some of the officers thought they were conducting a parole search, other officers thought they were conducting a consent search. The consent is valid. It's valid. Right? As you can tell, Your Honor, I think you're right. The timing is critical. And I think the timing and the facts in this case are such that even before that first encounter, every officer who made first contact before Officer Wise asked for consent believed they were conducting a parole search. They went there. Well, they tried to get that to conclude initially, however. You're telling her that they were conducting a parole search? I think that's the question. I think the closest that we have to the record is where Officer Wise justified that he had come from. He had come from 2000 in front of Mr. Copeland and said he could use you, so he just used you. What do we do with it? I think the district could also rely, and maybe I'm referring to this, that due to the nature of the small-volume attempted suicidal gun that the officers would have had an independent community caretaker who functioned the role to get into your apartment to make sure that someone was not actually inside and to secure any weapon that might be of use to you. Yes, but I think the factual circumstances in this case were such that when the police arrived at 905 Missouri, it was almost immediately clear to them that any exigency or emergency that was reported by the 911 call turned out to be false. So in some sense, the exigency was extinguished. As a matter of timing, assuming that there was no other victim besides Mr. Johnson, as far as the officers are responding to an attempted suicide, and according to the ex-girlfriend, it was Johnson who was the one who was trying to kill himself, and when the officers arrived and Johnson's standing, I guess on the balcony, it's pretty clear, and I guess the officers recognize that somebody else, if Johnson's right, he killed himself and he has not succeeded. Right, and I think the record is clear that the officers themselves realized that any potential emergency was extinguished by the time they showed up because they made contact. And that's what I'm telling you, the frequency limits are sure, and if the nature of the call suggests the presence of a weapon, at that point, no weapon had been secured, and a reasonable officer in those circumstances would want to clear the premises to make sure that there was not an intact someone injured inside and be located and secure a weapon if there was. In your answer, I think it seems that once you saw Mr. Johnson standing on the balcony, then it wasn't an attempted suicide call because that had disappeared with Mr. Johnson's I think my answer is slightly different than that. I think the answer is that in the factual scenario in this case, which is not disputed, even by the testimony of officers, there is a space in time in which they arrived at the scene, they made contact with Mr. Kalkwein, they made contact with Mr. Johnson, and the upstairs windows came downstairs, and all the officers at the scene recognized in their judgment at the scene at the time that any danger, immediate danger, had been extinguished if the two people who were in the house were already outside. So I think in that circumstance, it's a little different from saying the officers on the scene, as a matter of policy, would automatically, if they feel like they need to, get into the house and clear it out. Okay. I didn't mean to make you all white, but I was hoping you wanted to talk about the other two issues. Yeah. I think I want to go back to the cell phone search, but I think this case's discourse precedence in United States v. Lora applied rightly to probation searches as well. And so in light of Riley and Lora, I think it establishes that warrantless searches of a parolee's cell phone are also unreasonable under the Fourth Amendment. Well, why would that mean, given the Supreme Court's decision in Sampson, that basically the Supreme Court has warrantless search conditions on parole? And is your argument that a cell phone is entitled to a higher level of Fourth Amendment protection than a residence? Yes. Actually, the Supreme Court first, the Supreme Court recognized that in Riley. My argument is that there are differing degrees of protection, or isn't it still driven by cell phone? I don't know if the search is reasonable in those circumstances. It is still a reasonable analysis, but the Supreme Court at Riley made really clear that searches of cell phones have to be looked at uniquely separate apart from searches of any other possessions or even at home. But doesn't a different Fourth Amendment standard make that a requirement? Our argument is that the Supreme Court's decision at Riley recognizes that privacy interests in cell phones are higher than interests with a home and other objects. So on that one end of the spectrum, privacy interests in cell phones are higher. And that outweighs any marginal difference. Your argument is that the interest interests of cell phones are higher because there's a great deal of information, right? Correct. Suppose that the information was not held in a cell phone, but in a bunch of filing cabinets. Well, it's pretty important to talk about that in a precise situation. It's the way you access the data on a cell phone. It's the immediacy and the amount of data that you can access. And the way cell phones are developing in the future, it's not just an individual's data. It's a lot of data that even for a parolee and the police would otherwise be able to access in a physical way. Can you give me a circumstance where a cell phone can be searched without a warrant? I think the point is without a warrant. Yeah. In the exception of circumstances, exception is one kind of escape valve that the police can still use after Riley to search. And I think that is a good example of where you create a horrible city government seized with a dispensable deployment requirement for parolee cell phones isn't really that true, right? Because to the extent there is an emergency or an extreme circumstance. A parolee's filing system could be searched on a Samsung, but not a cell phone. Right. But there are other examples where, for example, a parolee's bank records or if a parolee had a safe deposit box at a bank or medical records in a doctor's office, you can access that through a phone without a warrant under Samsung. That's what the government's position is. But with a cell phone, you can access that, whereas the police don't need a warrant to get that information. And Riley isn't actually included in the parolee? No, he's not. I would never say that. That's correct. But the 9th Circuit of 2016, like it's called, you notice it's for Explorer, applied Riley's reasoning to the searches of probationers. I'm sorry, you said that. That's correct. Samsung said that. They argued for it. Our argument is that the increased privacy of cell phones outweigh the marginal difference between the government interested in searching a parolee or probationer. I'm sorry, you wanted to say something to me? Yeah, I want to make one last point really quickly on the Confrontation Clause violation. The statement that was admitted at trial that Ms. McAlpine made to another officer came through the double hearsay testimony of an officer who did not interview Ms. McAlpine and has actually never made contact with her. This was the only statement in the entire case that directly accused Mr. Johnson of possessing a gun found in 905 Missouri Street. It's exactly the type of testimonial hearsay the Supreme Court held in Crawford violates the Confrontation Clause. And so those errors will allow the government to admit that hearsay testimonial hearsay for the purported non-hearsay purpose. Don't we still analyze it even if there is a Constitutional violation? Don't we still analyze it under the totality of the circumstances and ask what other evidence existed in front of each other with Ms. McAlpine? Yes, sir. I think in light of the text message and Ms. McAlpine's use of her statement, it cannot be said that this was part of a violation of Ms. McAlpine. Thank you very much. Thank you. Good morning, Your Honors. May it please the Court, my name is Mary Jean Chan and I represent the United States in this appeal. The only error that the District Court committed in this case besides sentencing by failing to find a California robbery is the crime of violence under the Guidelines Provision 62K2.1. The District Court did not clearly err in finding after a full evidentiary hearing that McAlpine validly consented to the search of the Missouri Street apartment, nor did it err in finding that Johnson's parole condition permitted the search of both the residence and his cell phone, and its evidentiary claims were also correct. Today I'm going to address some of their other questions with three major points plus the also the sentencing issue, the three major points that my defense counsel raised. The search of the residence was an appropriate finding. The District Court found two bases independent for upholding the search. First was that McAlpine consented. This is not a clear error in its finding. I know that the defense counsel mentioned some testimony from Officer Wise. I wasn't able to find that in the record, but also as Judge Tolman mentioned, the entire purpose of having a fact finder decide things is they're a hard question sometimes. The fact finder is there watching the testimony, listening to the testimony. In this case, Judge Anderson listened to Ms. McAlpine. Not only did he actually see her testimony, but also he considered the testimony that she had previously given in state court, jail calls that she had had, and then looked at all the surrounding testimonies of seven officers who were at the scene and made credibility findings in this case that she had validly consented, not only consented, but validly so, that the officers had gone to her with a very pleasant demeanor, and that she had said, sure, go ahead and walk from the gun, or not from the gun, but that she did not stand herself up for her own insurance, but that she did not do that. I don't understand either. I don't think that it would entirely erode. I think it would potentially erode the consent, but the fact is that there are several factors here, and the factors for consent were whether she was in custody, she was not in custody, whether the officers had their guns on, they did not. They were very pleasant with her. Whether there were more random warnings that were given, there were not, because none were had to be given. And then whether she basically knew that she had the right to refuse or thought that it was sort of a feasible consent. In this case, there was no indication that she thought that this was a cruel search. As just Colin mentioned earlier, the officers had arrived responding to a 911 call. There was an emergency. They thought somebody had killed themselves or that there was some concern about that. So the entire nature of the call, I think, supports the finding that the call client thought that they were there responding to a 911 emergency call and said, go ahead, take a look in the house to clear it, just search for any potential gun. And Officer Wise said that he specifically said, you know, can we go and look to make sure there's nobody that's hurting there and search for any sort of gun, because the 911 call was very specific, that there was somebody who had killed themselves, and Johnson had killed himself before the firearm. And Johnson is the person who, in this case, it's not sort of ridiculous to think that he might have or thought. This is a violent felon, and officers knew that. The second part of the officer – I'm sorry, Judge Anderson's finding was that the search was justified under Johnson's cruel search condition. And I think that this also was the correct finding. There was – and Ms. Ford hasn't sort of mentioned any concern about the finding that there was probable cause to believe that Johnson, in fact, resided at the Missouri Street residence. And I think the district court, in this case, was correct in finding that there was probable cause. Johnson himself said, I live here. The call client, his co-resident, said he lives here. And they did this to police officers who knew that Johnson was on parole and subject to a parole condition. So this has to hold a lot of weight when you think about whether he would lie about this. And there was no reason for the officers to disbelieve him. Why? Because they knew that the address of record in Emeryville was a dress he was not allowed to be at because of the restraining order. Well, they knew that from the record. They had concerns with the record. And the other thing, Your Honor, is that when they found him, honestly, the response to the man on the call saying that he was going to be there, he was there, he came down and said that. And he wasn't just there sort of in the middle of the day. He was there on a Sunday evening. He came down and said, yes, I live here. So there was really no reason for the officers to be able to disbelieve him. There was probable cause to believe that there. In answer to another one, another record, was based on what they heard from their mobile data terminals or from radio communications in a routine call? Correct. So they knew it was a domestic restraining order barring him from being at Emeryville? I believe so. I believe so, Your Honor. And I would love to be able to sort of check that or just to confirm that. That's my understanding. And certainly the compiled sort of information of the officers in this situation was that they knew that they were deceived. That's one of the reasons there were so many officers responding to this. Moving on to this. Do you know to what extent he was at the station? I don't know. There had been a notice, and then officers had said that they hadn't necessarily read the notice. One had known about it. One wasn't sure that he knew about it. But the fact that Sergeant Jonas, who was part of the same station, had investigated a potential break-in at Preston Circle in San Francisco, that was Bonnie Ash's house. Bonnie Ash was a friend of Gina, who was the person who made the 9-1-1 call. Both of them had restraining orders out against Johnson. So there was this break-in or attempted break-in where they believed that Johnson was a suspect here. And so there was kind of a be-on-the-lookout notice for Johnson as a suspect, and it noted that he was dangerous, that he was a violent felon with a history of being connected to murderers, attempted murderers, domestic violence, assaults. So that any officers who came into contact with Johnson should take appropriate precautions. Does this strike a groundswell in their perceiving that he was a suspect? It's a spot that might be part of it. And certainly the fact that there was a 9-1-1 call suggesting that somebody had killed themselves with a firearm would also support that kind of a response, especially since we all know that suicide sometimes can turn into suicide murders, sometimes suicide by flu. So it warrants a lot of caution. With respect to the search of the cell phone, the district court also correctly found that this was supported by Johnson's cruel search concoction. His parole search condition, the California Parole Search Condition, is pretty absolute in this language, and it's correct. It says that the defendant, the parole lead, his residence, and any property under his control is subject to suspicionless search. So that really includes the cell phone in this case, and Johnson has not argued that the language any property under your control does not include the cell phone. It said he's arguing with Samson, which very absently says that a parole lead has no legitimate expectation of privacy with respect to those things that are covered by the search condition. It's somehow ruled back by Riley, and that's simply not true. This court has never held that, and Riley itself, if you look at the language, doesn't do anything close to that. Riley concerned the search needs to arrest, exception to the warrant requirement, an entirely separate requirement. And in that context, the Supreme Court has told that you can't search somebody's home. Generally, in traffic, it said that you can't search somebody's home as part of search intent to arrest. You can't even search a container unless it's something that's on them. So the entire exception is basically very, very immediate. It has to happen at the time of arrest. It has to be something that's within the person's reach, because the rationale for the search intent to arrest exception is that the person could be holding something that could prove to be harmful to the officer's safety, and that they could immediately destroy some sort of evidence. And the Supreme Court found that those two concerns are not particularly further when you're talking about cell phones. People are not going to generally use cell phones as weapons to hurt a police officer, and there are ways to pretty quickly block a cell phone so that you don't allow for the destruction of evidence. How do we reverse our decision? The Lara case dealt with probation search context, which is different. There is a continuum of search... Sorry, of punishments. Of privacy interests. Of privacy interests. Exactly. And so this is really sort of distinct, but even in Lara, what we have are very distinct factors, distinct people from this case. That case, you have a probationer. This case, we have a parolee. That case was a probationer that was non-violent. Here we have a very violent someone. There we had somebody who wasn't particularly... The only concern is that he might have been violating his probation condition by not showing up to meetings with his probation officer. Here we have somebody where there's a probable cause to believe that he was violating his restraining order against domestic violence and involving domestic violence, that he had ownership and possession of a gun, or he was a minor felon with a very violent history. So you have totally different sets of concerns that go on the way you look at the balancing scale. There was a question that was asked earlier about whether there's a difference with a balancing test. There isn't. There's one test. It's a balancing test. You look at the interests of the defendant's privacy, and you look at the government's interests, making them intrusion. Here you have very, very low expectations for privacy on the part of Mr. Johnson, his parole lead, which under Sampson says he has very negligible interest of privacy anymore. Not just his person, but his house. So when we talk about sort of cell phones, and cell phones contain a lot of data, but it's comparable to what you have, the privacy interests you have in your house. It isn't higher necessarily. It could be lower, but it's comparable. It's totally different than talking about comparing the data in a cell phone to what my pieces of paper in your pocket would use to arrive at most of the evidence. It's totally different. I'm saying that from this court, if we look at Laura, and we look at the line of probation cases that this court has held, the course has held, in terms of expectations for privacy, and the government's interest in invading or intruding on that. A person who has a violent past or a violent criminal record has fewer expectations of privacy, and the government has a higher interest in searching them and supervising them. So I think that in the parole lead context, it really in some ways shouldn't matter at all, because Sampson has made a blanket rule that says that when the search condition covers the search of your person, residence, any property under your control, that's it. Because you're a parolee, that's sort of the end of the story. But if we're going to sort of use Laura and those other cases where we're talking about probation, and that isn't the end of the story because it isn't just because you're a parolee and it's a blanket condition, then we still, even under that test, we should still be able to affirm, or this course has still affirmed, the district court. In terms of exceeding the scope, I think the district court found that it did exceed the consent, or the scope of the consent. We don't think that that was a correct ruling, but it's not purely erroneous as well. However, the fact that he gave some consent further diminished his expectation of privacy. So we have parolee, violent parolee, suspected of probable cause of crime in the phone itself. We have also the fact that prior to the search, he consented on two occasions to the officers looking at his phone during this exact time range. And I think it's also important to note that the text that we have here, we're not talking about metadata or some very, very esoteric part of his cell phone. We're talking about messages that the officer saw by made a noise scrolling through, and it's from and to a number that isn't identified. So it could have been to Nina. It could have been from Nina as far as Sergeant Jonas knew. So we think that the consent certainly plays in this analysis in favor of the district court's finding that there was a justified search. And the delay, I know that my colleague didn't mention it, but it's a very reasonable delay. And if you look at the Sullivan case, I think it makes it clear. The officer got the phone, immediately gave it to the Multimedia Center. When the Multimedia Center was able to completely copy it, download it, he looked at it immediately for three days. The Goldmine statements were not admitted erroneously either. First of all, the review here is plain error because they didn't make the confrontation clause that constitutes your argument at trial. It was a pure hearsay challenge. But under any standard, the statements were properly admitted. It was very clear. The jury was told by the district court that it was admitted only for the purpose of showing the course of the police investigation. One of the key elements of the police investigation was looking for the measures of coercion in the police investigation. It was basically the defendant's contention that it was actually to Keith Martin, who was McCall Blind's daughter's boyfriend who sometimes lived at the residence or had previously before they broke up, that the gun actually belonged to him and that the sloppy police work was the reason why they didn't find him or pursue him. And that really was to Keith Martin. So prior to initially the statement at issue, the defense had already admitted to Keith Martin's ground sheets to try to show that it was him. It wasn't effective in the end, but it was... I think they were trying to say that the sloppy police work hadn't been so sloppy. They would have realized that it was actually to Keith Martin, who owned the gun, and this was completely refuted by the text messages. It wasn't Jonas who said this. Exactly, exactly. They asked... Sergeant Jonas was the fifth witness at trial. They had asked about Keith Martin to three of the four witnesses prior to that. They had talked about this at length in their opening, and they had, in their preliminary priority trial, also indicated that they were going to pursue this line of defense. In light of that, the context of this, in light of the fact that there were limiting instructions, that the government didn't even return to this in its closing argument, and that there was overwhelming other evidence, including the fact that he had text saying that he had damaged his PT92 Dwarfist gun, and it matched what they found at the location where he and not just Keith Martin was at. There's just harmlessly unreasonable doubt. I haven't really addressed much the government's cross-up bill, but I think that a piece of this, that there was error and it should be remanded. The only thing is that I would ask this court to consider, in its order for remand, instructing the district court that on remand it should use, under 18 U.S.C. 3742G, the Guidelines Manual in effect on the date of the previous sentencing of the defendant prior to the appeal and not the current Guidelines Manual, only because that's sort of been a question that has been coming up in other cases, and some of the district courts can use that guidance. That could be right. I'm not sure, Your Honor. I think that must be right. If he's retired, then that has to be the case. For Mr. Thompson, perhaps. So we ask for an affirmance on all the other grounds, and thank you for your time. I want to touch on a few points for your brief, Your Honors. After Weiss's test studies, the record ER-163 and 165, the court's reference, the government made some arguments about how the police didn't have their guns on, Mr. McAlpine wasn't in custody. If you look at the cases, United States versus China, there's a case by this court, Humber versus North Carolina, it's pretty clear that there doesn't have to be that kind of show of a gun pointed in the police's face for consent to be involuntary. I can't hear your argument as to the district court's factual findings with regard to the application. No. Let me say that the legal test doesn't require that there be certain instances where a police has put their hand on a gun or merely acquiescing to an assertion of authority. It doesn't have to be a gun in the face. It's enough to render... Your argument is a mistake. Our mistake, Mr. McAlpine's mistake, in thinking that this is a parole search, is equivalent to coercion, and wishful thinking or consent. Right, caused by Officer Weiss's actions. Do you have a case that says a mistake as opposed to coercion is wishful thinking? I think Humber versus North Carolina and United States versus China, you made that clear. In Humber, the grandmother they defended opened the door and just walked in, the police walked in, and she had no idea if they could do it, had a warrant or not, and the Supreme Court said, do consent was an all-time requirement. McAlpine did testify that she knew that Johnson was subject to a search warrant. She did. Because he was on parole. Yeah, that's correct. And that he had given her address to his parole officer as the location where he was living. Right, but I think that's... So, doesn't that say something? I don't know your argument, but she was somehow coerced into it because she thought that the police were supposed to be on parole and such. She had prior warning that it was a condition that was attached to his parole. Her address was now at risk of a parole search. Right, but that parole condition only applies in her home insofar as he actually lived there in his armistice that he did. But he testified that he was... He was no right guest. I thought she testified that she, like him, used her address with his parole officer as where he was living. I think you caught it right there, correct? Yes. But I do not think that makes that her... that's the situation where by providing that address it means that she also subjected herself to Johnson's parole search condition. Right, but I guess my question is, do you get a bad fact for your argument, which is the fact that she did all of her entertainment services when police officers arrived at her front door and her home was subject to a parole search in order for her to be in her home? I think there's a difference between getting the parole officer an address and her actually understanding and... or her affirmatively making... subjecting her home to Mr. Johnson's parole search condition. I think there's a distinction there. Thank you for your arguments. Thanks for your... Thanks very much. Your case is disarguing. This is a better parole condition decision as soon as we can.
judges: Siler, Tallman, Bea